A99A1482. GRANT et al. v. GEORGIA PACIFIC CORPORATION et al.
(521 SE2d 868)

MCMURRAY, Presiding Judge.

Plaintiff John Earl Grant, Jr., administrator of the estate of the decedent, John Earl Grant, Sr., and plaintiff Flora Mae Scott as sur-

viving spouse, brought this wrongful death action against defendants Georgia Pacific Corporation, Georgia Pacific Resins, Inc. (collectively "Georgia Pacific"), and Fleet Transport Company ("Fleet"), alleging that John Earl Grant, Sr., a driver for defendant Fleet, and an invitee at a Georgia Pacific plant in Brunswick, Georgia, was negligently "exposed to turpentine sulfate and died as a result." Specifically, defendants were negligent in failing to provide a mask or other breathing apparatus; failing to instruct plaintiffs' decedent on the proper procedure for loading turpentine sulfate, such as wearing a mask; failing to instruct plaintiffs' decedent on the dangers of working around turpentine sulfate; and failing to warn of the dangers of turpentine sulfate fumes, which allegedly caused the death of plaintiffs' decedent. Defendant Fleet admitted that John Earl Grant, Sr. drove a tractor pulling Fleet's trailer to a Georgia Pacific plant in Brunswick in order to transport a turpentine sulfate product, but denied that Grant's death was the result of any negligence on its part. Georgia Pacific admitted that plaintiffs' decedent was an invitee at its Brunswick mill and that he died on the premises, but also denied this resulted from any negligence on its part.

After discovery, all defendants jointly moved for summary judgment. Viewed in the light most favorable to plaintiffs as the nonmovants, the record reveals the following, largely undisputed, facts:

Grant had made pickups from this plant before. On the day in question, he was found face down on top of his tanker truck. According to the pathologist, Milton J. Arras, M.D., the decedent had "severe coronary artery disease," and suffered a fatal heart attack. Death was "instantaneous. . . . He just dropped dead." In the opinion of Dr. Arras, "excessively strong odor and/or vapors of the sulfated turpentine had a high probability of precipitating a myocardial infarction." Bonifacio T. Floro, M.D., also thought the heart attack itself "was precipitated by inhalation of the turpentine fumes." Specifically, the mixture of turpentine fumes with the open air reduced the amount of oxygen Grant received in the breathing process. Quitman Tanner, a safety liaison at the Georgia Pacific mill deposed in an affidavit that the processing of pine trees at the Georgia Pacific mill emits a noticeable odor of turpentine; that he observed Grant in and on the truck while the tank was being loaded; and that, on this particular occasion, the odor of turpentine was "no more pronounced than usual." Likewise, Kenneth Dean Knapp, the former safety manager at this mill, detected no unusual turpentine odors that day. Knapp confirmed that visiting drivers, such as Grant, formerly were issued COM-FO II respirators, consisting of "a breathable air charcoal filter that screwed in on each side of the face plate," but later Georgia Pacific switched to issuing a five-minute escape bottle "because it had a clear plastic bag and five minutes of com-

pressed breathable air. . . . [T]ruck drivers can have beards; they can have false teeth that they didn't put in; they could wear glasses; a lot of things that would break the seal of a normal respirator." On site, each driver had to be within arm's reach of the five-minute escape bottle. In practice, drivers were to leave the escape bottle on the nearest fender while working atop their truck. The air bottle is designed for emergencies, to escape hazardous gas such as chlorine. Instructions are written on the package. The escape bottle for which Grant signed was found in his cab, not on the fender. There was also a respirator in the cab, but this was not issued by Georgia Pacific.

Plaintiffs submitted the deposition of Henry A. Vartanian, a consultant in the field of industrial hygiene, occupational safety, with a degree in chemical engineering from Northeastern University. Industrial hygiene is the "recognition, evaluation and control of workplace health hazards." For 21 years, Vartanian performed enforcement inspections for the Occupational Safety & Health Administration ("OSHA"). In his opinion, Grant did not have "proper respiratory protection or . . . the respiratory protection may not have been proper for the function he was performing." Specifically, Vartanian opined that Grant should have been provided with a "supplied air system[, which] involves a half mask . . . with air supplied . . . from a compressor, a compressor reservoir, cylinders." It is a generally accepted practice in respiratory protection, where a person is working in an unknown atmosphere, that the employee be "provided with the highest level of protection available and then downgrade [after] air sampling and testing determines that something else is appropriate." But Vartanian could not state that an employer without such a program was in violation of OSHA standards. Vartanian also testified that employers have a duty to "inform any contractors coming on site so far as the hazards are concerned and the protective measures required," based upon his understanding of the applicable Code of Federal Regulations.

The trial court granted defendants' motion for summary judgment, and pursuant to an extension of time, this appeal followed. Plaintiffs argue that genuine issues of material fact remain as to each element of their ordinary negligence claims. *Held*:

1. As against the estate, the grant of summary judgment is correct because there is no evidence to support any award of damages for the deceased's pain and suffering. A judgment that is correct for any reason must be affirmed. *Shapiro v. Lipman*, 259 Ga. 85, 86 (377 SE2d 673).

> At the outset, we recognize that an individual's claim for wrongful death [of a spouse or child] and an estate's claim for the decedent's pain and suffering are distinct

causes of action. See generally OCGA §§ 51-4-2 (a); 51-4-5 (b); *Complete Auto Transit v. Floyd*, 214 Ga. 232 (2) (104 SE2d 208) (1958).

*Smith v. Mem. Med. Center*, 208 Ga. App. 26, 27 (1) (430 SE2d 57). Where, as in the case sub judice, the medical evidence is that death was instantaneous, and there is no evidence the decedent exhibited consciousness of pain, recovery for the decedent's pain and suffering is not permitted. See 25A CJS 899, Death, § 99, fn. 40. Accord *Monk v. Dial*, 212 Ga. App. 362 (1) (441 SE2d 857) (consciousness of imminent death, evinced by attempts to evade, supports award for pain and suffering in fatal auto crash).

2. The question becomes whether the trial court erred in granting summary judgment against the surviving spouse's OCGA § 51-4-2 claim for the full value of the decedent's life.

(a) There is considerable doubt that plaintiffs have adduced admissible evidence of any breach of duty of care. Experience has shown that loading liquid turpentine from bulk storage tanks in the open air produced a noticeable, even pronounced, but not stupefying, odor of turpentine. There is certainly no evidence that exposure to the typical level of turpentine vapor created by outdoor loading was itself toxic or even nauseating. In our view, Vartanian failed to specify that turpentine is in fact a hazardous substance the commercial loading of which is regulated by OSHA or any other federal agency. Indeed, he admitted that the failure to provide a supplied air system was not a violation of OSHA standards. Consequently, his expert opinion that Grant was not afforded appropriate respiratory protection (a self-contained air unit) is speculative, conclusory, and nonprobative. *Motorola v. Ward*, 223 Ga. App. 678, 679 (1) (478 SE2d 465).

(b) Even assuming, but not deciding, that defendants breached a duty of ordinary care owed to the invitee contract carrier by exposing him to the customary levels of turpentine fumes or vapor produced by outdoor loading, we conclude that neither the failure to warn of that obvious exposure nor the failure to provide a respirator suitable for use while plaintiff Flora Mae Scott's decedent was on top of the tanker amounts to the legal cause of Grant's demise.

"If the plaintiff by ordinary care could have avoided the consequences to himself caused by the defendant's negligence, he is not entitled to recover." OCGA § 51-11-7. It is undisputed that Grant had a respirator in the cab of his truck at the time he began loading the turpentine. In our view, the legal consequence of Grant's failure to use the safety equipment (respirator) he had the foresight to bring on his own amounts to a failure to exercise ordinary care to avoid the consequences to himself of the risk posed by the pervasive and pun-

gent turpentine. *Union Carbide Corp. v. Holton*, 136 Ga. App. 726, 730-731 (2) (222 SE2d 105). Accord *Powell v. Harsco Corp.*, 209 Ga. App. 348, 349-350 (2) (433 SE2d 608) (alleged inadequacy of installation instructions cannot be the proximate cause of fatal collapse of the catwalk, where the installer did not read the instructions actually provided). The trial court correctly granted summary judgment, based on the entire record before us.

*Judgment affirmed. Andrews, P. J., and Ruffin, J., concur.*

DECIDED AUGUST 30, 1999.

*Scott B. Parks*, for appellants.

*Whelchel, Brown, Readdick & Bumgartner, J. Thomas Whelchel*, for appellees.