Nancy C. **WALKER, Individually and as the Natural Parent of Dinesica Walker, a Deceased Minor, and in her capacity as the Personal Representative of the Estate of Dinesica Walker, a deceased minor, Plaintiffs**

v.

**BLITZ USA, INC., Defendant.**

**Civil Action No. 1:08–CV–121–ODE.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 30, 2009.

Gant Grimes, Hank Anderson, Anderson Law Firm, Wichita Falls, TX, Robert Cape Buck, The Buck Law Firm, Atlanta, GA, for Plaintiffs.

James Scott Murphy, Garrity, Graham, Murphy, Garofalo & Flinn, Montclair, NJ, Michael Jay Goldman, Kim M. Jackson, Hawkins & Parnell, Atlanta, GA, for Defendant.

## ORDER

ORINDA D. EVANS, District Judge.

This products liability case is before the Court on Plaintiff's motion to compel discovery [Doc. 114], Defendant's motion for summary judgment [Doc. 120], Plaintiff's motion for leave to file an amended complaint [Doc. 138], Plaintiff's motion to exclude the expert opinion testimony of Vytenis Babrauskas [Doc. 139], Defendant's motion to strike the expert report of Andrew Armstrong [Doc. 155], Defendant's motion to strike the expert report of Arthur Stevens [Doc. 157], Defendant's motion to strike the expert report of Jason Mardirosian [Doc. 158], and Defendant's motion for leave to respond to Plaintiff's motion to compel discovery [Doc. 163].

For the reasons stated below, Plaintiff's motion for leave to file an amended complaint is DENIED. [Doc. 138], and Defendant's motion for summary judgment is GRANTED. [Doc. 120]. Defendant's motions to strike the expert reports of Armstrong, Stevens, and Mardirosian are GRANTED IN PART and DISMISSED IN PART AS MOOT. [Docs. 155, 157, 158]. Plaintiff's motion to exclude the expert opinion testimony of Vytenis Babrauskas is DISMISSED AS MOOT. [Doc. 139]. Plaintiff's motion to compel discovery is DISMISSED AS MOOT [Doc. 114] and Defendant's motion for leave to respond to Plaintiff's motion to compel discovery is DISMISSED AS MOOT [Doc. 163].

## I. OUTLINE OF THE CASE

Plaintiff Nancy C. Walker, individually and as the natural parent of Dinesica Walker,[1] a deceased minor and in her capacity as the personal representative of the Estate of Dinesica Walker filed this

---

1. In the Complaint originally filed, the decedent was identified as "Dicease Walker," which was a typographical error. [Doc. 1–2, at 3]. The correct name of Plaintiff's daughter is "Dinesica Walker." [Doc. 31–10, at 5].

case against Defendant Blitz USA Inc. and other defendants[2] in the State Court of Fulton County, Georgia. The case was removed to this Court. Diversity jurisdiction exists because Plaintiff is a Georgia citizen; Defendant Blitz is incorporated in Oklahoma and has its principal place of business in Oklahoma. The matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

Plaintiff seeks damages for injuries to herself and for the wrongful death of her daughter. According to her complaint, the injuries and death were caused by a defect in a gasoline container manufactured and sold by Defendant. Plaintiff contends that the gasoline container was defective because it did not include a "flame arrester." In the case of Defendant's product, this would be a metal mesh or perforated metal device within the spout of the container. The purpose of such a device is to keep flames from entering the container in the event of ignition of gasoline vapor emanating from the spout. For purposes of the instant motion for summary judgment the Court assumes that these devices work for their intended purpose.

The evidence of record shows without dispute that Plaintiff accidentally set her clothing on fire while she was trying to light a wood stove using gasoline as an accelerant. She ran out of the mobile home in which the wood stove was located and ran past a Blitz brand gasoline container on the front porch. The Blitz container had no flame arrester in it. According to Plaintiff's testimony, the container held about 5 ounces of gasoline. There is no eyewitness testimony that the gasoline container exploded. The mobile home was totally consumed by the fire originating at the wood stove. Plaintiff's daughter was asleep inside the mobile home and died in the fire. Plaintiff was badly burned. Her theory, which is totally a function of expert testimony, is that as she ran by the gas container her flaming clothing ignited gas vapor emanating from the gas container's spout, causing a flashback inside the container and the explosion of the container. Plaintiff theorizes that the alleged container explosion cast gasoline and flames onto her as she ran by the container. She also theorizes that the alleged explosion cast gasoline and flames back into the interior of the mobile home, thereby causing or contributing to her daughter's death.

Plaintiff has made the following claims against Defendant: negligence in the design of the container and failure to provide adequate warnings (Count I),[3] strict liability for a defective product (Count II), strict liability for failure to warn (Count III), strict liability for failure to test (Count IV), wrongful death (V), damages for pre-death

---

2. All defendants other than Defendant Blitz USA, Inc. ("Defendant" or "Blitz") have since been dismissed from the action without prejudice. [Docs. 37, 134].

3. Plaintiff has included 36 separate allegations of negligence within Count I. [Compl., Doc. 1–2, ¶¶ 25(a)–25(jj). A large number of these allegations relate to Defendant's failure to design the gas container with a flame arrester or Defendant's failure to include an adequate warning on its gas container. The remaining allegations in Count I are related to Defendant's business of manufacturing gasoline containers. [See, e.g., id. at ¶ 25(o) ("[Defendants] failed to actively seek data and

information and maintain a library documenting incidents in which consumers, users, and bystanders are injured and/or killed when encountering such defective portable gasoline containers," or ¶ 25(aa) ("[Defendant] failed to request that the ASTM International F15.10 Subcommittee consider a standard to include flame arresters and/or explosion suppression materials in portable gasoline containers").

Because the Court finds that there is no evidence that a gasoline container explosion caused the injuries to Plaintiff or the death of her daughter to survive summary judgment, it is unnecessary to recite all of Plaintiff's remaining claims of negligence here.

injuries and pain and suffering (Count VI), and punitive damages (Count VII).

Plaintiff and Defendant have stipulated to the facts that the content of the warning on the container was adequate, and that Plaintiff makes no claim as to the content of the warning. [Doc. 136].

Defendant's motion for summary judgment argues that (1) the Blitz gas container is not defective on account of the lack of a flame arrester in its spout, (2) the labeling and warnings on the product are adequate, and (3) there is no evidence that Defendant's product was the actual cause of injury to Plaintiff or her daughter. Plaintiff has responded to all of these arguments. Because the Court finds that argument (3) is meritorious, summary judgment will be granted on this ground alone and the other arguments will be dismissed as moot.

## II. FACTS

The following facts are undisputed by the parties or alternatively represent the version of the evidence favorable to Plaintiff: [4]

On the morning of December 8, 2006, Plaintiff Nancy Walker and her 23–month-old daughter Dinesica Walker arrived at the mobile home of Plaintiff's mother in Rochelle, Georgia around 7:00 in the morning. Plaintiff would stay at her mother's mobile home when she had days off and her other children had to go to school, because her children could catch the school bus at her mother's home. [Walker Dep., Doc. 122, at 62–64]. The bus arrived at around 7:00 a.m. [*Id.* at 52]. Her mother had already gone to work when Plaintiff arrived. [*Id.* at 72].

The front of the mobile home faced south, and a screened-in porch extended along almost the entire front side. The front door to the mobile home was located in the middle of the trailer, and it opened onto the screen porch. [*Id.* at Ex. 4]. If facing the front door of the mobile home from the outside, the door knob was located on the right side of the door and the door swung onto the porch to the left. [*Id.* at 43–44, Ex. 1]. The door to enter the screened in porch from outside the trailer was located at the east end of the porch. Someone exiting the front door of the mobile home would be required to turn left before proceeding toward the screen door and walking outside. [*Id.* at Ex. 4]. Upon entering the mobile home through the front door, two bedrooms and a bathroom were on the west end. The living area was in the middle. The wood stove was located at a mid-point in the living area with its back close to the north wall. [T. Cheese Dep., Doc. 128, Ex. 1]. The wood stove had a metal stack which presumably vented through the roof. The kitchen area was to the right (east) of the wood stove; there was no wall or other partition between the living area and the kitchen area.

After they arrived at the mobile home, Plaintiff's daughter Dinesica Walker went to sleep on a sofa to the left (west) of the wood stove. [Walker Dep., Doc. 122, at 108–109; Killiebrew Dep., Doc. 147, at 17]. Available portable electric space heaters may (or may not) have been in use. The propane-generated gas heater and gas cooking stove were not in use; the propane tank had not been refilled in a couple of months. The outdoor temperature that day was around 32° Fahrenheit, possibly less. [Doc. 165–5 at 2]. Plaintiff decided to light a fire in the wood stove. [Walker Dep., Doc. 122, at 38]. Plaintiff's mother rarely used the wood stove; she explained

---

**4.** Because the parties largely dispute the admissibility and credibility of the expert opinions in this case, any "facts" drawn from expert reports and deposition testimony will be set forth only in the Court's legal analysis as to the admissibility of those opinions.

that she had experienced a problem with birds in the vent stack. [E. Cheese Dep., Doc. 124, at 16].

Plaintiff initially used charcoal lighter fluid in her attempt to ignite the wood in the stove, but she found there was insufficient lighter fluid in the container to start a fire. [Walker Dep., Doc. 122, at 37–38, 70–72, 74–76]. She testified that prior to the day of the accident, she had never used gasoline to start a fire in the wood stove; she had only used lighter fluid. [*Id.* at 39].

Plaintiff had seen a gasoline container located next to a lawnmower on the screened-in porch. During her deposition, Plaintiff identified a red Blitz model 50810 plastic gasoline container, with a capacity of approximately two gallons, as the type of container that was sitting on her mother's front porch that day. [*Id.* at 64, 111, Ex. 5].[5] Plaintiff recalled seeing the Blitz logo on the container. [*Id.* at 64–66].[6] She also recalled that either the word "inflammable" or "flammable" was written on the container, and that there was additional writing on the container that was difficult to read. [*Id.* at 64, 66–68]. She did not attempt to read this additional writing. [*Id.* at 67–68].

Plaintiff testified in her deposition as follows: She retrieved a small empty vegetable can, about the size of a twelve ounce soda can, from her mother's garbage. [*Id.* at 38, 79]. She took this can out to the porch, set it down, and poured a small amount of gasoline from the container into the small can while standing on the porch.

[*Id.* at 38, 79, 106–108]. Plaintiff testified that when she lifted the gasoline container, it was very light, and she was able to lift it with one hand. [*Id.* at 80]. Plaintiff initially poured all of the gasoline that was in the container into the can. This filled the can about halfway full with gasoline. [*Id.* at 84]. She thought that she had poured too much gasoline into the can and that "it might explode" if she used that much gasoline, so she then poured most of the gasoline back into the gasoline container. [*Id.* at 82, 84–87]. She testified that after pouring the excess back into the gasoline container, there was still a "little bit" of gasoline left in the small can, about "half of a big … spoon." [*Id.* at 86–87]. She screwed the cap-and-spout unit back onto the container. [*Id.* at 83, 107]. There was no cap on the outer end of the spout. [*Id.* at 62, 111]. Plaintiff then set the gasoline container down on the porch to the right of the front door into the mobile home (if facing north, entering the mobile home), with the spout facing toward the door. [*Id.* at 106–107, Ex. 4].

Plaintiff testified that when she re-entered the home, she poured the gasoline in the small can onto the top of the wood that was in the wood stove. [*Id.* at 89]. She then reached into the stove and put a lit match on the wood. She heard a "whoosh," and her right leg and foot caught on fire below her knees. [*Id.* at 90–92]. Walker does not know if she had gotten any gasoline on her clothing. [*Id.* at 90]. She first tried to beat the fire out

---

**5.** Exhibit 5 depicts a plastic two gallon and 8 ounce container (7.81 liters). It has a "jug" type plastic handle on one side of the top of the container. The plastic handle is an integral part of the container. On the other side of the top of the container is a twist-off plastic cap from which a narrow plastic spout protrudes. In other words, the spout is an integral part of the twist-off cap. The model depicted in Exhibit 5 is a "self-venting" model, meaning that there is no separate vent on the top of the container which may be opened to facilitate pouring. Instead the spout itself contains a separate channel for air.

**6.** Plaintiff's half-brother testified that his father purchased this gasoline container from a Fred's store in Hawkinsville, Georgia in 2004. [T. Cheese Dep., Doc. 128, at 29–30]. He also recalled that the container was a Blitz container. [*Id.*].

and then ran out the main door of the mobile home yelling "Help, help". [*Id.* at 90, 91, 110]. Her legs were on fire as she ran outside. She does not recall whether her pants above her knees were on fire, or whether her shirt was on fire. [*Id.* at 92–93].

Plaintiff initially stated in her deposition that she did not know whether any part of the room was on fire when she exited the mobile home, and that she did not know whether anything else in the home was on fire when she ran out. [*Id.* at 94]. Plaintiff later stated that there was nothing else on fire inside the mobile home when she ran outside. [*Id.* at 143].

At some point, a "boom" occurred. Plaintiff gave varying statements in her deposition as to where she was when she heard this "boom." She initially testified that as she was running: "when I got to the screen door, I heard a boom." [*Id.* at 91]. She later testified that she heard a "boom" before she got to the screen door [*Id.* at 103], and also that when she heard the "boom," she was on the ground outside. [*Id.* at 117]. She also stated that she was unsure exactly how long she had been outside on the ground before she heard the "boom." [*Id.* at 118]. Still later, she said that she did not hear a "boom" when she was outside, but rather before she went outside. [*Id.* at 119]. Plaintiff also testified that she did not know where the "boom" came from. [*Id.* at 117].

Plaintiff does not know whether she knocked over the gasoline container as she ran out of the house. [*Id.* at 109–10]. She admits she did not see the gasoline container explode. [*Id.* at 135, 137]. She does not recall whether she saw any additional fire or whether she was hit by any additional flames or gasoline when the "boom" happened, or whether the porch caught on fire at that point. [*Id.* at 139–40].

Mamie Grace, a neighbor living next to Plaintiff's mother, was standing in her kitchen when she looked out her kitchen window and saw a large amount of white smoke pouring out of the front screen porch area of Plaintiff's mother's mobile home. [Grace Dep., Doc. 148, at 16–17]. The smoke was coming out of the entire front porch screen area. [*Id.* at 17]. She then went to her living room, picked up her telephone, and called 911. [*Id.* at 18]. After telling the 911 operator the address of the house on fire, Grace walked to her own front porch. [*Id.* at 18–19].

Grace testified that she heard a "boom" at about the same time that she got to her front porch [*Id.* at 20–21]. She did not know where the boom came from [*Id.* at 12], and does not know where Plaintiff was located when the "boom" occurred. [*Id.* at 6, 7, 20]. Grace did not see any flames prior to hearing the "boom". [*Id.* at 17]. When the "boom" occurred, Grace could see flames coming out of the front porch. [*Id.* at 29–30]. The flames were so strong that they caught a car adjacent to the mobile home on fire. [*Id.* at 29, 36]. Grace did not see Walker running out of the mobile home. [*Id.* at 19, 35].

Shortly after Grace heard the "boom," she heard Walker screaming and saw her standing outside next to the doorstep. [*Id.* at 19–22, 25]. Walker was screaming "my baby." [*Id.* at 24, 25, 28]. Plaintiff appeared burned and she had no clothing on other than her underwear. [*Id.* at 24]. It is unclear whether Plaintiff's clothes were burned off or whether she had removed them.

At 9:27 a.m. police officer John Killiebrew was notified by the 911 call center of Grace's call. He was about one quarter mile from the fire scene at that time. He saw an intense smoke cloud coming from that direction. It took him about one minute to get there. [Killiebrew Dep., Doc.

147, at 6]. The mobile home was totally engulfed in flames when he arrived, and no one was able to enter. [*Id.* at 14]. He observed that Plaintiff was intensively burned on the front part of her body. [*Id.*]. He testified that the body of Plaintiff's daughter was found on the north side of the mobile home, just outside the structure of the house. [*Id.* at 25–26]. Killiebrew spoke to Plaintiff at the scene, and he wrote in his police report: "According to Nancy Walker she was starting a fire in a wood burning heater in the mobile home with gasoline. When she tried to light the wood the gasoline exploded burning Mrs. Walker and setting the mobile home on fire." [*Id.* at 21–23, Ex. 1]. Killiebrew stated during his deposition that he could not remember whether "explosion" was the exact term she used. Plaintiff never said anything to him about a second explosion. [*Id.* at 23]. Killiebrew stated Plaintiff was "very distraught" when he spoke with her. [*Id.* at 28].

Bruce Gourley, an arson investigator with the Georgia Office of Insurance Commissioner, inspected the scene on the day of the accident with a K–9 dog trained to detect the presence of ignitable liquids by sniffing for hydrocarbon. [Gourley Dep., Doc. 129, at 9–11]. Gourley first determined that the fire's origin was in front of the wood stove, inside the mobile home, and that the specific point of origin was at a point where he located gasoline in front of the stove. [*Id.* at 23, 32]. After determining the location of origin he brought the K–9 dog to the location, and the dog "alerted" on the area in front of the wood stove. [*Id.* at 29]. Gourley himself smelled the area and noted a heavy gasoline odor. [*Id.* at 33–34]. Gourley testified that there was enough gasoline in front of the wood stove that it "had saturated into the carpet padding." [*Id.* at 55–56]. He determined this was the area of origin of the fire and sent a carpet sample to the Georgia Bureau of Investigation ("GBI") laboratory.

[*Id.* at 31–32, Ex. 3]. The resulting GBI report revealed the presence of gasoline in the carpet sample. [Doc. 136–2]. Gourley testified that there were other spots to the right of the stove where the K–9 alerted, which also smelled of gasoline. [*Id.* at 52–54]. To save time and money, he did not take samples from these areas because they were not as strong as the sample in front of the stove. [*Id.* at 53]. He did not use the dog to thoroughly search the location of the porch. [*Id.* at 58].

The fire was determined to be accidental. [*Id.* at 61]. No Blitz container was found at the scene of the fire. [*Id.* at 61–62]. Neither is there any evidence that anyone ever looked for such a container.

Plaintiff testified repeatedly during her deposition that she understood the dangers of using gasoline on the day of the accident. Plaintiff testified that she knew only to use a little bit of gasoline so as not to cause a big fire and "not to get it out of control." [Walker Dep., Doc. 122, at 79]. She stated that she understood that gasoline would "cause a big fire" and could "whoosh," or "might blind you, it might mess you up badly … it might mess up your face." [*Id.* at 26]. She testified that she had understood these dangers since she was a little girl. [*Id.* at 26–27].

Plaintiff testified that she put gasoline into a small can on the day of the accident because she knew she should not take the jug into her mother's house, because "I know that would cause an explosion." [*Id.* at 38, 88]. She also testified that she knew on the day of the accident that she should use less gasoline than lighter fluid because gas is "more powerful" than lighter fluid, and that "if you use a lot of gas, it might explode." [*Id.* at 78]. She stated repeatedly that her concern that the gas would explode was the reason that she did not use much gasoline on the day of the accident. [*Id.* at 78, 82]. She also testi-

fied, however, that on the day of the accident she did not know that gasoline could cause an explosion. [*Id.* at 79].

Plaintiff was admitted to the Joseph M. Still Burn Center on December 8, 2006, and remained there until March 20, 2007. [Mullins Dep., Doc. 143, at 10–11]. She had severe burns on her ankles, legs, front torso, right arm and armpit, the right side of her face and the top of head. She had burns on 43% of her body. [*Id.* at 11, 19, 22, 23, unmarked photographs].

## III. DISCUSSION

### A. *Motion to Amend Complaint*

The Court DENIES Plaintiff's motion. Discovery in this case ended on February 6, 2009, and Defendant's motion for summary judgment was filed February 26, 2009. [Doc. 44, 120]. Plaintiff's motion to amend the Complaint was filed on March 3, 2009. [Doc. 138]. Plaintiff states that she seeks to amend the Complaint to reflect the dismissal of the allegations against those defendants that have been previously dismissed from this suit, to correct a typographical misspelling of Dinesica Walker's name, to reflect stipulations of fact agreed to by the parties, to "conform" the allegations in the Complaint to the evidence obtained during discovery, and to add an alleged act of negligence under Count I of the Complaint. According to Plaintiff, the amendments are not intended to alter the claims that Plaintiff asserted in her original Complaint or to circumvent any of Defendant's arguments in the pending summary judgment motion.

Given Plaintiff's delay in amending the Complaint, Plaintiff s motion for leave to file an amended complaint is DENIED. [Doc. 138].

### B. *Plaintiff's Expert Witness Testimony*

As support for her theory that the defective design of Defendant's gas container caused her injuries and the death of her daughter, Plaintiff has presented the testimony of expert witnesses. Defendant argues that the opinions of these expert witnesses fail to meet the standard for expert testimony established in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and thus that they should be ruled inadmissible. The Court must therefore determine whether the testimony of these experts is admissible under *Daubert* and the Federal Rules of Evidence.

In reviewing the proffered testimony of Plaintiff's experts, it is important to keep Plaintiff's theory of causation in mind. Her theory is not that the gas container, after becoming engulfed in flames from the fire which began at the wood stove, became superheated and exploded. Her theory is as follows: as she was running past the gas container on the front porch, her burning clothes caused vapor allegedly emanating from the spout of the container to ignite. Then, the flaming vapor entered the container's spout due to its defective design (lack of a flame arrester) causing a flashback inside the container. This flashback allegedly caused the container to explode. The explosion allegedly threw gasoline and flames onto Plaintiff as she ran by, exacerbating or adding to her already sustained injuries. Also, Plaintiff theorizes that when the gas container exploded, gasoline was sprayed into the interior of the mobile home, reinforcing or spreading the existing fire. Thus, she alleges that a gasoline container explosion was the cause in fact and a proximate cause of her injuries and of the death of her daughter.

Defendant's response is that there is no evidence that the gas container exploded and no evidence that a flashback occurred. Alternatively, if the gas container exploded, it happened after the interior fire overtook the porch and engulfed the gas con-

tainer in the flames, causing an explosion due to expanding vapor pressure within the container.

The only evidence in Plaintiff's own testimony that supports her theory is that she heard a "boom" either as she was running across the porch or after she had left the porch. She does not know where the boom came from. She did not see or perceive flames or spewing gasoline coming from the container and did not see a breakup of the container. Therefore, testimony that the container actually exploded before the porch became engulfed in flames must necessarily come from others. There are no eyewitnesses to an explosion of the gas container. Plaintiff has presented expert testimony seeking to fill this void.

■ Federal Rule of Evidence 702 authorizes the admission of expert opinion testimony "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed.R.Evid. 702. "Rule 702 lays the foundation for the trial court's *Daubert* analysis." *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1237 (11th Cir.2005). Under *Daubert*, expert testimony is admissible if: (1) the expert is competent and qualified to testify regarding the subject matter of his testimony; (2) the methodology by which the expert reached his conclusions is sufficiently reliable; and (3) the expert, through scientific, technical or specialized expertise, provides testimony that assists the trier of fact to understand the evidence or determine a fact in issue. 509 U.S. at 589–96, 113 S.Ct. 2786.

■ The burden of laying the proper foundation for the admission of expert testimony is on the party offering the expert, who must show by a preponderance of evidence that the testimony is admissible.

*Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir.1999). However, the proponent must only prove that the expert testimony is reliable, not that it is scientifically correct. *Id.* at 1312. To aid in this inquiry, the Court in *Daubert* identified several non-exclusive factors which a district court may consider. These factors include: (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community. 509 U.S. at 593–94, 113 S.Ct. 2786.

■ These factors are not limited in application to solely scientific testimony, but also apply to testimony based on "technical" or other "specialized" knowledge. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The factors are not intended to be a "definitive checklist"; a district court has the flexibility to narrowly tailor the factors to the specific situation presented. *Daubert*, 509 U.S. at 593, 113 S.Ct. 2786. Regardless of what factors are specifically relied upon, however, the district court's ultimate responsibility is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152, 119 S.Ct. 1167.

Plaintiffs have offered the testimony of three expert witnesses: Andrew Armstrong, Ph.D., Jason Mardirosian, and Arthur Stevens. Stevens did not evaluate the issue of causation in fact, so his expert report and testimony will not be discussed in this Order.

Plaintiff asked Armstrong "to evaluate the conditions necessary for an explosive environment to be produced in a two gallon plastic container and to determine if a flame arrester would prevent the explosive vapors from forming". Mardirosian was asked: (1) "What was the source of the 'boom' noise?" and (2) "Which of the two fire incidents at the subject structure: the initial ignition of gasoline vapor at the wood burning stove or the subsequent explosion was the most likely cause of Dinesica Walker's death?" Armstrong and Mardirosian each prepared a written expert report which is in evidence. [Armstrong Report, Doc. 58–3; Mardirosian Report, Doc. 58–2 at 2–29; Amended Mardirosian Report, Mardirosian Dep., Doc. 130, Ex. 3]. Each was deposed concerning his opinions.

Armstrong conducted tests which successfully created flashbacks in plastic containers holding gasoline but which did not cause the container to rupture or explode. Having done this, he noted that work done by Dr. Lori Hasselbring had shown that "it is possible for plastic gasoline containers to violently explode". [Doc. 58–3 at 3]. Armstrong did not offer his own opinion that the Blitz container on the porch probably exploded.

Mardirosian concluded that "the only logical cause of the boom" was an explosion of the gasoline container on the front porch, which he said occurred just after Plaintiff ran by. He assumed that a flashback within the gas container was the cause. In his deposition, Mardirosian explained that in answering question (2) he had relied on work done by Dr. Lori Hasselbring, in particular a video of her "Michigan Fire Test No. 10" which is in the record. [Armstrong Dep., Doc. 132, Ex. 29]. Hasselbring's article, *Case Study: Flame Arresters and Exploding Gasoline Containers*, is listed as a reference source in Mardirosian's expert report.

Thus, Mardirosian based his assumption that a flashback occurred in the container and that the container actually exploded on work done by Hasselbring, not on his own education, training or experience.

The dynamic of a flashback, and the circumstances under which it might cause a violent explosion of the type described by Mardirosian, is not within the experience of average jurors. It is not intuitive. It requires expert testimony. As stated previously, Plaintiff's defective product claim is not based on a theory that the Blitz container exploded after it became engulfed in flames and became superheated. To be viable as a defective product claim, Plaintiff's theory necessarily must be that a flashback (that would have been prevented by a flame arrester in the spout of the container) occurred which caused the container to explode.

Both sides agree that gasoline has certain basic physical properties, as follows: Gasoline in its liquid state does not burn; only gasoline vapors burn. Gasoline vapors are created when gasoline evaporates. The density of gasoline vapor is about 3.4 times that of air. In a closed static environment (for example, a closed container sitting still) containing gasoline vapors and air, gas vapors sink to the bottom. This relationship may be changed by introducing a state of disequilibrium; for example, by shaking the container.

Also, the parties agree that the flammable range for gasoline vapors is between 1.4% and 7.6% volume of vapor in air. Above the upper flammability limit, there is too great a concentration of vapor in the air to permit a flame to propagate; below the lower flammability limit, there is not a sufficient concentration of vapor in the air to permit propagation of a flame. Altering the ratio of air to vapor changes the flammability level.

The parties also agree that "The term 'explosion' has no fixed ordinary or scientific meaning. One accepted definition is 'a release of energy creating a sudden outburst of gas'" (internal cite omitted). "This broad definition includes chemical, atomic, and physical explosions. Physical explosions can occur due to overpressures of boilers or pressure vessels .... In combustion science, an explosion is any rapid, high-temperature combustion ...." Vytenis Babrauskas, *Ignition Handbook* 14 (2003).

Consistent with the foregoing, the amount of gasoline vapor in air which will exceed the upper flammability limit in a two gallon container is surprisingly small. Indeed, the amount of gas vapor which will produce a ratio below the upper flammability limit in a two gallon container is fairly characterized as tiny—a small fraction of the vapor which would be produced by the five ounces of gasoline that apparently was in the Blitz container on the porch. This presents an obstacle to Plaintiff's theory of causation, because while a tiny amount of gasoline mixed with a vastly larger amount of air can vaporize and can produce a "flash" in a container when vapor at the end of spout is ignited, the "flash" in the container is of a modest nature, making an explosion of the container unlikely.

### 1. *Expert Testimony of Andrew Armstrong*

Dr. Armstrong is the owner of Armstrong Forensic Laboratory, Inc., which he founded in 1980. Armstrong has a Ph.D. in physical chemistry and is a professional chemist certified by the American Institute of Chemistry. He is the author of many publications regarding the identification of ignitable liquid in fire scenes and frequently provides consultation in cause and origin investigations. [Armstrong Dep., Doc. 132, Ex. 46].

To carry out his assignment Armstrong performed certain tests, some of which used Blitz two gallon plastic containers. Videos of these tests are in the record. [Armstrong Dep., Doc. 132, Ex. 17, DVD titled "A8–4133, File Production"]. Armstrong did not attempt to duplicate conditions existing on the day of the fire. In the three tests using two gallon Blitz containers holding very small amounts of gasoline, Armstrong achieved "flashbacks" inside the container after repetitive ignition efforts. He elected to call these flashbacks (literally seen as a "flash" in the container) "flashback explosions". He noted that "although the observed explosions did not rupture the container, it has been shown in work done by Dr. Lori Hasselbring that it is possible for plastic gasoline containers to violently explode and rupture". [Armstrong Report, Doc. 58–3, at 3]. The report lists various "video-documented demonstrations of Dr. Lori Hasselbring" as among the materials reviewed by Armstrong in preparing his expert report. The video disks are exhibits to the transcript of Armstrong's deposition. [Armstrong Dep., Doc. 132, Ex. 28, DVD titled "9 Fire tests Series Human Pour"].

Some of Armstrong's tests used metal one-gallon paint cans which had been rigged with large add-on spouts and holes for tubing to be inserted. The tubing was used to pump a constant flow of air of 1.28 liters per minute into the paint cans. Small amounts of gasoline were inserted using hypodermic needles. Then, a flame was touched to the end of the spout. If nothing happened after an interval of time, the flame would be touched to the spout again. This sequence was repeated until something happened—a flash (referred to in Armstrong's report as an "explosion") and in several cases a flame inside the metal can. In some cases, the lid of the container popped off. These tests, in the Court's opinion, were so dissimilar to the known facts in the instant case that the test results prove nothing of value concerning the causation issue in this case.

Armstrong performed additional tests using actual Blitz plastic gasoline containers, both one gallon and two gallon sizes. Again, gasoline was injected into the container by hypodermic needle. The amounts of gasoline were small, 3 to 10 milliliters (2/3 teaspoon to 2 1/4 teaspoons). Again, he injected a constant flow of air into each container of 1.28 liters per minute. [Armstrong Dep., Doc. 132, at 89]. These elements were intended to create (and in some cases did create) a gasoline vapor-to-air relationship in the container within the flammability range. Again, a flame was touched to the tip of the spout at intervals until some reaction occurred.[7] In several instances a flash occurred inside the container, which Armstrong elected to call an explosion. No flames were generated and there was no gasoline thrown from the container. No gasoline was left in the container at the end of this test; evidently, all of the gasoline vaporized. In two instances the container jolted when the flash occurred; in one case, it jumped up and fell over on its side. None of the containers exploded or ruptured. Armstrong's expert report states:

> Although the observed explosions did not rupture the container, it has been shown in work done by Dr. Lori Hasselbring that it is possible for plastic gasoline containers to violently rupture.

[Doc. 58–3 at 3].

The Court is looking for evidence which would support Plaintiff's claim that an explosion of the container on the porch actually occurred following a flashback. Armstrong's tests do not supply that evidence. As Armstrong himself admitted, the conditions for his tests were markedly different from those existing on the day of Plaintiff's

accident. He used an artificial air stream and minute quantities of gasoline so as to create a vapor-to-air ratio below the upper flammability level. Also, his many unsuccessful efforts to ignite the vapor demonstrate the very unpredictable nature of vapor ignition.

As is discussed below in connection with Jason Mardirosian's testimony, Plaintiff's reliance on Dr. Hasselbring's tests to supply evidence of causation in this case is misplaced. The Court certainly accepts the general proposition that plastic containers (containing gasoline) can rupture or explode. But that is not germane to the causation issue in this case. The question in this case is whether the gasoline container on the porch exploded on account of a flashback which occurred through the spout of the container. For the reasons discussed below, the results of Hasselbring's tests are inadmissible and even if they were, they do not illuminate this issue.

 While Armstrong's expert report did not state that a gasoline container explosion caused Dinesica Walker's death, he opined during his deposition that if the fire had not been exacerbated by the alleged explosion of the container, "there may have been time for either the neighbor or Ms. Walker to get back into the house and crawl low, do the standard fire low approach things and get the child that was sleeping ..." [Armstrong Dep., Doc. 132, at 175]. This testimony is not based on Armstrong's specialized knowledge or expertise, is not based on specific facts, and would not be helpful to a trier of fact. It is just speculation. Therefore, Armstrong's opinion as to the cause of Dinesica Walker's death is inadmissible.[8]

---

7. In the three runs using the two gallon plastic containers (Demonstration 4, Runs 3, 4, and 5) it took the following numbers of ignition efforts before achieving a flashback: two, ten, six. In the two runs using one gallon

Blitz containers, the plastic spout melted and either folded shut or fell off.

8. It is unnecessary to reach the admissibility of Armstrong's other conclusions as to the

## 2. *Expert Testimony of Jason Mardirosian*

 Mardirosian is a fire investigator with the Office of Fire Investigations for the Chicago Fire Department, a private investigator, and a part-time police officer. [Mardirosian Dep., Doc. 130, at 100, 104, 107–109, Ex. 6]. He is a certified fire and explosion investigator with the National Association of Fire Investigators, among other certifications, and has a significant amount of experience in the investigation of fire scenes. [Mardirosian Dep., Doc. 130, Ex. 6].

Mardirosian did not examine the scene of the fire. [Mardirosian Dep., Doc. 130 at 38, 78]. The fire was on December 8, 2006 and he was hired by Plaintiff's counsel in 2008. He based his expert report on deposition transcripts, fire investigative reports, and scene photographs. [Amended Mardirosian Report, Mardirosian Dep., Doc. 130, Ex. 3 at 1]. The reference material for the report included the article by Hasselbring as well as a video of "Michigan Fire Test No. 10," which Mardirosian had viewed.

Mardirosian's conclusion that the *only* logical source of the "boom" is an explosion of a gas container on the porch is not reliable because his attempts to rule out other sources of the "boom" were too cursory. His expert report merely stated that the boom could not have been caused by an exploding can of vegetables or a popping tire on the lawnmower (the lawnmower tires were solid rubber and even if they had been the inflated type they would not cause a boom). Having ruled out these two sources, the report then stated that "testing performed on gasoline containers and their propensity to explode when exposed to flaming combustion shows that the 'boom' described at the scene and the flame propagation which followed was most likely the Blitz brand container exploding on the porch." [*Id.* at 12]. The only tests referenced in Mardirosian's expert report are tests done by Hasselbring, discussed below.

After Mardirosian's expert report was turned in and his deposition taken, Mardirosian submitted an affidavit ruling out additional causes of the "boom," specifically aerosol cans, falling debris, and a "BLEVE"[9] event, in which a gas container becomes engulfed in flames and explodes when the gasoline boils. [Doc. 185].[10] This still is too cursory an effort. The photographs of the fire scene offer no close-up views of the debris at the site [Mardirosian Dep., Doc. 130, Ex. 12]. The depositions of Plaintiff and her mother (which Mardirosian reviewed) offered practically no information concerning the contents of the home. Mardirosian did not have enough information to decide that the gas container on the porch was the *only* logical source of the "boom" noise, rather than one possible source of the boom. He also did not consider other possible explanations based on the information he did have.

---

feasibility of designing a gas container with a flame arrester or the prevention of explosions using a flame arrester. Defendant's *Daubert* motion as to these additional opinions is DISMISSED AS MOOT.

9. BLEVE is an acronym which stands for "boiling liquid, expanding vapor explosion".

10. A BLEVE could be the explanation for the boom, if the "boom" occurred after the porch caught on fire and heated up the gas container. However, this would not support Plaintiff's theory that the absence of a flame arrester on the container caused her injuries. A flame arrester would not have kept the container from exploding once it became engulfed in flames and it became superheated. A flame arrester only would have kept flames from entering the spout of the container, assuming Plaintiff's flaming clothing contacted the spout and ignition occurred.

Mardirosian testified about his conclusions in his deposition. For his assumption that the gas container on the porch probably exploded and threw burning gas into the interior of the mobile home, he relied on Hasselbring's Michigan Fire Test No. 10, a video of which had been provided to Mardirosian by Plaintiff's counsel. The video of Michigan Fire Test No. 10 is available in the record as an exhibit to Plaintiff's Response to Defendant's Motion for Summary Judgment. [Doc. 165, Ex. S].[11]

No written test protocol for Michigan Fire Test No. 10 is in the record, except to the extent that the beginning of the video shows a flash card which states:

Fire Test # 10

2 cups gasoline

40% evaporated

No flame arrester

* shake gas can

The video shows a mechanical arm advancing a dark red plastic container to a position above a metal cylinder sitting on the ground. The cylinder has an ignited flue poking out of one side. Once the container is in position above the flue,[12] the arm turns it over so the spout is pointed downward. Liquid gasoline (apparently two cups) is seen pouring onto the ignited flue from the spout. The distance between the end of the spout and the ignited flue appears to be several inches. When the gasoline hits the flue large flames leap upward, engulfing the container in flames. The container bounces around in the flames. It is possible that some flames are coming out of a break in the side of the

container. The container did not explode. Near the end of the video it is seen sitting on the floor some distance from the camera while flames continue to burn on the ground in front of the container. The container is not displayed for the viewer at the end of the video.

Mardirosian also stated in his deposition that he relied on an article authored by Hasselbring entitled "Flame Arresters and Exploding Gasoline Containers," published in the *Journal of Hazardous Materials* in 2006. [Mardirosian Dep., Doc. 130, Ex. 5]. The thrust of the article is that flashbacks can generate explosions of plastic gasoline containers in a wider variety of circumstances than one might expect; therefore, plastic gasoline containers should have flame arresters. This article had been supplied to him by Plaintiff's counsel.

The article begins with the proposition that a flashback phenomenon can cause an "explosion" in a plastic gasoline container where the correct ratio of gas vapor to air exists and an ignition source is applied at the pour opening or spout. While the title to the article may imply otherwise, the text of the article clarifies that by "explosion", Hasselbring does not mean the breakup or rupture of the container. Rather, "For purposes of this article, an explosion refers to the rapid release of burning gasoline from a gas container accompanied by a loud noise." The article later refers to the "loud noise" as a "whooshing noise". [*Id.* at 66].

After stating the basic properties of gasoline, the article describes static tests and gasoline spill tests conducted by Hasselbr-

---

**11.** The video is on a DVD labeled *"Walker v. Blitz* 1:08–cv–0121, Exhibit 'S' to the Memorandum of Law in Support of Plaintiff's Response to Defendant's Motion for Summary Judgment." Though the actual DVD is labeled Exhibit S, on Plaintiff's exhibit index it is listed as Exhibit M. [Doc. 165–3]. Another copy of the Michigan Fire Test No. 10 video is located in the record as Exhibit 29 to the transcript of Dr. Andrew Armstrong's deposition. [Doc. 132].

**12.** While it is not totally clear, it appears that a flame is lit at the end of the container's spout just before it comes to rest above the cylinder.

ing in 2002 and an account of an incident in which a boy was severely burned while either pouring or attempting to pour gasoline on a fire.

According to the article, the static tests roughly confirmed the expected flammability range for gasoline. 13.5 milliliters (three teaspoons) of gasoline placed in an empty 5 gallon gasoline container [13] did not ignite upon application of a flame; [14] the mixture was too rich to burn. 2.25 milliliters (one-half teaspoon) of gasoline placed in an empty gasoline container did not ignite upon application of a flame; the mixture was too lean to burn. Intermediate amounts of gasoline, from 4.5 to 9 milliliters (one to two teaspoons), ignited and produced what Hasselbring classified as an explosion in those cases where there was not a flame arrester at the opening of the container. According to the article, "these explosions consisted of a whooshing noise as flames and gasoline spewed out the pour opening." [Id.]. No video or audio recordings were made of the static tests.

The facts pertaining to the gasoline spill tests are unclear in the article. In the three tests which are potentially most pertinent to the causation issue in this case (because of the amount of gasoline involved), varying amounts of gasoline (two cups, one cup, ½ cup) in a 5 gallon plastic container were spilled "near a fire contained in a dirt pit." [Id.]. Liquid gasoline "was poured near burning paper or propane". [Id.]. In two of the three instances this "resulted in spraying burning gasoline outside the dirt pit." The article did not state that any of these tests resulted in a broken or ruptured container.

Videos (with no audio component) were made of the five gallon gasoline spill tests. These videos are in the record. [Arm-

strong Dep., Doc. 132, Ex. 28, DVD titled "9 Fire tests Series Human Pour"]. The procedure each time was to hold a plastic container holding a specified amount of gasoline over a flame. In tests 1 and 2 the container had a spout and an open vent; in test 3 it had a pour opening on the top and an open vent but no spout. A small fire was created in the middle of a circular configuration of rocks and dirt on the ground. The individual holding an extender fastened to the plastic container would slowly rotate it downward until it was upside down over the fire. At this point gasoline came pouring out of the container's spout (or pour opening) onto the fire below. Nothing happened until the gasoline hit the flame. This caused a flare-up of flames which, each time, surrounded the container. While the article contended that flashbacks (called explosions in the article) occurred inside the container in the tests involving two cups and one cup of gasoline (but not with one-half cup), the flashbacks cannot be visually confirmed due to the dark red coloration of the containers. In two cases (two cups, one cup) a momentary spurt of flaming vapor came out of the container's spout a distance of 2–3 feet after the individual holding the can pulled it back to an upright position. No explosions or ruptures of the containers occurred.

Finally, Hasselbring's article relates an incident involving a fourteen-year-old boy who was burned when he was either pouring or attempting to pour gasoline on a small flame in a fire pit. [Mardirosian Dep., Doc. 130, Ex. 5 at 64]. There was about one gallon of gasoline in a five gallon plastic container. [Id. at 67]. While the boy was tipping the container to pour gas

---

13. The containers had no spout. Each had an open vent and an open pour opening.

14. A wick soaked in gasoline was the ignition source. The part of the wick which extended outside the container was lit and allowed to burn down into the container.

on the flame, something catastrophic occurred which is not expressly identified in the article. As a result of whatever occurred the boy lost consciousness. He woke up on the ground, with his legs burning. A neighbor heard an explosion and rushed outside. An enormous fire was burning, with flames up to ten feet high. The neighbor found remnants of the gas container some distance away from the fire pit. According to the article, the fire department described the cause of the incident as: "Accidental flammable ignition of a gas can to exposed flame causing the can to explode spattering the victim with gas and flame". The article states that the police investigation revealed that the fire was started "by a vapor fumes explosion". [*Id.* at 64]. Hasselbring appears to assert that the cause of the incident was a flashback inside the gasoline container; she asserts that although the ratio of gas vapor to air in the container considerably exceeded the upper flammability limit for gasoline, the ratio was sufficiently altered by the tilting of the container to bring about a potentially explosive condition in the gas container [*Id.* at 67]. She appears to assert that when sparks or flame from the fire pit reached the gas vapor coming out of the spout of the container, a flashback occurred inside the container which caused it to explode.

In the summary section of her article Hasselbring states, "There are a number of variables that contribute to whether or not a gasoline container will explode," and there are a number of "known ignition variables" including the percentage of gasoline vapors in the atmosphere in the container, temperature, humidity, wind speed, winter versus summer blends of gasoline, and whether or not gasoline is being poured out of the can. "With all these variables," Hasselbring concludes, "it is difficult to determine combinations of them that may lead to a gas container explosion." [*Id.*].

Hasselbring's theory about the incident involving the fourteen year old boy is not clearly supported by the facts set forth in her article. The facts described would equally support a theory that the boy poured gasoline on the fire, creating a flare up which caused him to drop the container into the fire, causing the container to explode. In this scenario, dumping a large amount of gasoline on a fire likely would cause a huge flare up which would heat up the gasoline and cause the container to explode after it hit the ground.

While the article's title suggests that it is about "exploding containers" which could be avoided with a flame arrester, in fact the article contains no clear information concerning an explosion of a container caused by a flashback. The tests described in the article did not result in any exploding containers at all. Also, anecdotal events, such as the one involving the fourteen year old boy, are a questionable basis for scientific conclusions. There is no reliable information that a flashback caused the boy's injuries. This fact, plus the disclaimer in the summary section of the article, leads the Court to question whether Mardirosian read the article before deciding to rely upon it.

The Court notes that Hasselbring has acted as litigation consultant and expert witness for Plaintiff's counsel in the past in numerous product liability cases involving alleged explosions of plastic containers containing gasoline. While that fact alone does not discredit her work, it does call for extra scrutiny because of possible bias.

The fact that there is no sworn testimony in the record concerning the conditions under which Hasselbring conducted her tests renders her test results inadmissible. Federal Rule of Evidence 703 does allow an expert to rely on facts and data not independently admitted in evidence under

certain circumstances,[15] but only where "their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect". For all of the reasons previously stated, the Court cannot make that determination in this case. In addition, as noted, Hasselbring's article and her tests do not "fit" the circumstances in this case. The main point of her article was to urge that plastic gasoline containers have fire arresters, not to state formulas for proving causation in cases where the containers did not have fire arresters. Hasselbring's article and tests have been mis-used to try to prove a point she did not directly address in her article.

Mardirosian's conclusion that a gas container explosion was the most likely cause of the death of Plaintiff's daughter is sheer speculation. His report stated that the explosion of the gas container on the porch "violently propelled burning gasoline omni directional, including back inside the living area of the subject structure." [Doc. 58–2 at 14]. It stated that although the large gasoline spot in front of the wood stove probably came "from the initial incident," the spots of gasoline to the right of the wood stove "were most likely the result of burning gasoline being propelled from the ruptured container to that area of the kitchen." As stated previously, Mardirosian's conclusions are simply based on an assumption that an explosion of the container on the porch occurred. These conclusions are not based on his own training and experience, but are drawn from his reading of Hasselbring's article and Michigan Fire Test No. 10.

In summary, the testimony of Armstrong and Mardirosian on the issue of causation is inadmissible under *Daubert*. It would confuse the jury, does not fit the facts of this case, and is unreliable in the respects previously discussed. Neither expert was asked to directly address the issue of causation regarding possible explosion of the container on the porch. The key question is, given the circumstances existing on the day of Plaintiff's accident, is it likely that a flashback through the spout of the container occurred? If it did occur, is it likely that the container exploded? Secondly, the expert opinions which were provided would not aid the trier of fact because they are not sufficiently tied to the actual circumstances which existed on the day of Plaintiff's accident. The expert testimony Plaintiff has presented nibbles around the edges of the key question: whether the container on the porch likely exploded. Neither Armstrong nor Mardirosian were asked to opine whether given the actual facts (two gallon plastic container with narrow spout containing about five ounces of gasoline, sitting on a porch [16]) a flashback would likely have occurred when Plaintiff ran by with her clothing in flames, assuming that the flames came near enough to the spout.[17]

15. Reliance on facts and data outside the evidentiary record may be invoked "[i]f of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject ..." Rule 703. It seems doubtful that this requirement is met here; in any event Plaintiff has not addressed it.

16. Plaintiff's brief indicates her belief that other facts are relevant: the outdoor temperature was 32° Fahrenheit or less, the gasoline was "weathered," Plaintiff had poured gas out of and back into the container a few minutes before Plaintiff ran by with her clothing in flames. Plaintiff may well be right that these are relevant considerations. However, this does not solve the basic problem that no expert witness was asked the essential causation question, either with or without Plaintiff's add-ons.

17. The issue of whether Plaintiff's pathway came close enough to the spout to permit ignition of any existing vapor trail would be a jury question at trial. Of course, Plaintiff's own testimony at trial would have to supply this evidence. Her deposition testimony does not supply it.

Further, if a flashback occurred would it have caused an explosion of the container?

## C. *Defendant's Motion for Summary Judgment*

### 1. *Standard of Review*

The Court will grant summary judgment when "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is not genuine if it is unsupported by evidence or is created by evidence that is "merely colorable" or "not significantly probative." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Similarly, a fact is not material unless it is identified by the controlling substantive law as an essential element of the non-moving party's case. *Id.* at 248, 106 S.Ct. 2505.

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). When the non-moving party bears the burden of proof at trial, the moving party's initial burden is to negate an essential element of the non-moving party's case or to show that there is no evidence to prove a fact necessary to the non-moving party's case. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 606–08 (11th Cir.1991). When the moving party bears the burden of proof at trial, it "must demonstrate that 'on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party.'" *Irby v. Bittick*, 44 F.3d 949, 953 (11th Cir.1995) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1438 (11th Cir.1991)).

Only after the moving party meets this initial burden does any obligation on the part of the non-moving party arise. *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548; *Chanel, Inc. v. Italian Activewear of Florida*, 931 F.2d 1472, 1477 (11th Cir.1991). At that time, the non-moving party must present "significant, probative evidence demonstrating the existence of a triable issue of fact." *Id.* If the non-moving party fails to do so, the moving party is entitled to summary judgment. *Four Parcels of Real Prop.*, 941 F.2d at 1438.

All evidence and justifiable factual inferences should be viewed in the light most favorable to the non-moving party. *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1532 (11th Cir.1987); *Everett v. Napper*, 833 F.2d 1507, 1510 (11th Cir.1987). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Four Parcels of Real Prop.*, 941 F.2d at 1438 (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505). However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

### 2. *Analysis*

Defendant seeks summary judgment as to all of Plaintiff's claims, arguing that: (1) Plaintiff has no evidence that the design of its gas container is defective and (2) there is no evidence that an explosion of a Blitz gas container caused any of Plaintiff's injuries or the death of her daughter. Because there is no genuine issue of material fact, and Defendant is entitled to judgment as a matter of law on argument (2), Defen-

dant's motion for summary judgment will be granted on that ground. It is unnecessary to reach the issue of whether Defendant's gas container is defective because it lacks a flame arrester.

### a. *Requirement of Causation*

■ Causation is an essential element in both strict liability and negligence cases involving alleged design defects or inadequate warnings. Georgia's strict liability statute states:

> The manufacturer of any personal property sold as new property directly or through a dealer or any other person shall be liable in tort, irrespective of privity, to any natural person who may use, consume, or reasonably be affected by the property and who suffers injury to his person or property because the property when sold by the manufacturer was not merchantable and reasonably suited to the use intended, and its condition when sold *is the proximate cause of the injury sustained.*

Ga.Code Ann. § 51–1–11(b)(1) (emphasis added);[18] *see Davenport v. Ford Motor Co.*, Case No. 1:05–CV–3047–WSD, 2007 WL 4373601, at *2, 2007 U.S. Dist. LEXIS 91245, at *6–*7 (N.D.Ga. Dec. 12, 2007) (unpublished opinion). "Unless the manufacturer's defective product can be shown to be the proximate cause of the injuries, there can be no recovery." *Jonas v. Isuzu Motors Ltd.*, 210 F.Supp.2d 1373, 1377 (M.D.Ga.2002) (quoting *Talley v. City Tank Corp.*, 158 Ga.App. 130, 279 S.E.2d 264, 269 (1981)).

■ The element of causation is also required in negligence cases. "To recover damages in a tort action, a plaintiff must prove that the defendant's negligence was both the 'cause in fact' and the 'proximate cause' of [the] injury." *Ogletree v. Navistar Int'l Trans., Corp.*, 245 Ga.App. 1, 535 S.E.2d 545, 548 (Ga.Ct.App.2000) (internal citations omitted). "With respect to factual causation (often referred to as the causal 'link' or 'connection' between an act or omission and an event), we have held that '[t]he defendant's conduct is not a cause of the event, if the event would have occurred without it.'" *Id.* (internal citations omitted).

■ The plaintiff has the burden to prove causation. *Ogletree*, 535 S.E.2d at 550. "As a general rule, issues of causation are for the jury to resolve and should not be determined by a trial court as a matter of law except in plain and undisputed cases." *Id.* at 548. However, "a reasonable inference sufficient to create a triable issue of fact cannot be based on mere possibility, conjecture, or speculation ... Consequently, [t]he plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result ...." *Id.* at 548 (internal citations and quotation marks omitted).

■ Even if the expert reports and deposition testimony of the above experts were admissible, the evidence would be insufficient to allow a reasonable jury to

---

18. Claims brought under Georgia's product liability statute, O.C.G.A. § 51–1–11(b), fall into one of three categories: (1) design defects, (2) manufacturing defects and (3) packaging/labeling defects. *Banks v. ICI Americas, Inc.*, 264 Ga. 732, 733, 450 S.E.2d 671 (1994). While this statute imposes strict liability, it does not convert manufacturers into insurers of their products. *Id.* at 737, 450 S.E.2d 671. In order to succeed on a design defect claim, a plaintiff must establish that the risk associated with a product exceeds the product's utility. *Id.* at 738, 450 S.E.2d 671. And a plaintiff alleging a manufacturing defect or a packaging/labeling defect will not succeed if the product was "properly prepared, manufactured, packaged and accompanied with adequate warnings and instructions ...." *Id.* at 733, 450 S.E.2d 671 (internal citations and quotation marks omitted).

find causation under Georgia law given the speculative nature of the experts' conclusions. Where an expert's opinion testimony is founded on an unsupported premise, it gives rise to an inference that is based on speculation and has no evidentiary value. *Id.* at 550 (citing *Grant v. Ga. Pacific Corp.*, 239 Ga.App. 748, 521 S.E.2d 868 (1999)). The Court in *Ogletree* stated the following:

> As we have held, '[n]o inference of fact may be drawn from a premise which is wholly uncertain.' ... And, inferences must be based on probabilities rather than mere possibilities ... Moreover, when a party relies on inferences to prove a point, not only must those inferences be factually based, they must tend in some proximate degree to establish the conclusion sought and render less probable all inconsistent conclusions
> . . . .

*Id.* (internal quotation marks and citations omitted). Because the opinions of Plaintiff's experts as to the cause of her injuries and the death of her daughter are based on speculation, they would not provide an adequate basis to survive summary judgment even if they were admitted into evidence.[19]

### b. *Plaintiff's Remaining Evidence*

 Other than the expert testimony proffered by Plaintiff, there is no evidence in the record that the container on the front porch of the mobile home actually exploded or likely exploded on the day of the accident or, if it did, that it caused Plaintiff's injuries or the death of Plaintiff's daughter. There are only two lay witnesses who reported hearing a "boom"—Nancy Walker and Mamie Grace. Neither of these witnesses actually saw the gasoline container on the front porch explode. Neither witness knows with any certainty where Plaintiff was located when the "boom" occurred. In order for Plaintiff to have been injured by an exploding gas container, she would have had to have been near the container when it exploded (assuming that it did explode). Even assuming that the Blitz gas container on the front porch of the mobile home exploded when Plaintiff ran past it, there is no evidence, other than the mere speculation of Plaintiff's experts, that such an explosion had anything to do with the death of Dinesica Walker.

The Court notes that one version of Plaintiff's testimony is that she heard a boom at around the time she was in the vicinity of the container on the porch. The Court does not believe this is enough for her case to survive summary judgment, given that she did not see the container explode, did not see or perceive flames coming from the container, and did not know where the "boom" noise came from.

Plaintiff argues that Defendant's expert witness, Vytenis Babrauskas, author of a treatise on ignition and fire, offers some evidence that the gasoline container exploded.[20] The following passage appears in Babrauskas' treatise:

> Actual explosions of portable gasoline containers are rare, because this requires that the vapors inside be below the [upper flammability limit].[21] This can happen in extremely cold climates. In temperate climates, explosions have

---

**19.** Plaintiff also submitted the deposition testimony of John Gillispie, Vice President of Engineering at Eagle Manufacturing Company. [Doc. 142]. Plaintiff designated Gillispie as an expert witness. Gillispie was subpoenaed to testify. Gillispie's testimony involved his own testing of flame arresters and the use of flame arresters in Eagle's products. [Doc. 142]. His testimony lends no support to Plaintiff's theory that the gas container on Plaintiff's front porch exploded and caused her injuries or the death of her daughter.

**20.** Plaintiff has filed a *Daubert* motion to exclude the testimony of Babrauskas, which is discussed below.

**21.** Babrauskas' treatise describes flammability limits as follows:

been known to occur while *emptying* a container. The process of emptying the liquid pulls air into the container and a region within the container can get created that is below the [upper flammability limit].

Babrauskas, *Ignition Handbook* 852 (2003) (emphasis in original).

Babrauskas published a corrigenda to his book on his website, which stated that the above claim about explosions occurring in temperate climates "is not supported by the published literature," and that there have been no case histories published documenting such an event and no experiments supporting this suggestion, and that, instead, experimental work has shown that containers do not explode. [Babrauskas Dep., Doc. 154, Ex. 21]. Babrauskas testified that he published this corrigenda when he realized that there was not substantive evidence to support the statement he had made in his book. [*Id.* at 102]. Plaintiff claims that Babrauskas only changed his mind regarding his statement in March of 2008 after he was contacted by counsel for Blitz. [Doc. 165–5, at 9; Babrauskas Dep., Doc. 154, at 96–97].

Even disregarding the corrigenda, Babrauskas' statement in his book does not provide evidence tending to prove that the gas container exploded on the front porch on the day of the accident. First, Babrauskas states that explosions are rare and happen only under the correct conditions. Second, there still is no evidence in the record that taking into account all relevant conditions, a flashback likely occurred or that the container likely exploded in this case.

### c. *Plaintiff's Inadequate Warning Claim*

To the extent that Plaintiff argues that an inadequate presentation of the warning on the gasoline container led to her injuries or the death of her daughter, her claim also fails. Plaintiff has stipulated that the content of the warning was adequate, so her claim is limited to the allegation that the presentation of the warning was too hard for her to read or was not conspicuous enough. [Doc. 136].

 Where a plaintiff is aware of the danger that the plaintiff claims he or she should have been warned against, the failure to warn is not the proximate cause of the plaintiff's injury. *Bodymasters Sports Ind., Inc. v. Wimberley,* 232 Ga. App. 170, 501 S.E.2d 556, 561 (1998); *Daniels v. Bucyrus–Erie Corp.,* 237 Ga.App. 828, 829–30, 516 S.E.2d 848 (1999). Plaintiff stated several times during her deposition that she understood the dangers of gasoline and the potential for gasoline to ignite, cause severe injury, and cause an uncontrollable fire. Even if she had read the warning on the gasoline container, it would not have given her information that she did not already know.[22]

---

It is found experimentally that when a fuel gas is mixed with air, flame propagation cannot occur if the fuel gas concentration is too small or too great. The limiting concentration values are known as the *lower flammability limit* (LFL) and the *upper flammability limit* (UFL). They are normally expressed as a percent of fuel, by volume, in air, but occasionally are provided in other units, for instance, grams of fuel per $m^3$ of mixture. In older literature, they are often identified as the LEL (lower explosion limit) and UEL (upper explosion limit). In a rough way, flammability limits can be understood to arise because flames need a minimum temperature to exist. Too much air or too much fuel dilutes the mixture enough that a sufficient temperature rise cannot be achieved. This explanation is extremely simplified and actual prediction of flammability limits from basic science concepts is very difficult ...

Babrauskas, *Ignition Handbook* 44 (2003) (emphasis in original).

**22.** The parties have stipulated that the content of the warning was adequate. However,

Plaintiff submitted an affidavit on March 23, 2009, claiming that although she understood that gasoline was dangerous on the day of the accident, she did not understand the danger of gasoline *vapors*. [Doc. 171]. She claims that if she had understood the danger of gasoline vapors she would have moved the gasoline container to the corner of the porch rather than leave it by the door or she would have stayed far away from the gasoline container while running across the porch. [Doc. 171].

It appears that Plaintiff seeks to undo a stipulation of fact entered into and filed by the parties on March 2, 2009 (that there is no claim that the warning on the gas container was inadequate). The Court will not allow the affidavit to effect this change, and will disregard it to this extent.

Second, even if the Court accepts Plaintiff's affidavit, it does not change the conclusion of this case. As the Court has held, there is insufficient evidence that a gas container explosion on the porch of the mobile home was either the cause-in-fact or the proximate cause of Plaintiff's injuries or the injuries and death of her daughter. Therefore, there is also insufficient evidence that if Plaintiff had read the warnings on the container and understood the dangers of gasoline vapors, and if she had heeded the warnings and stayed far away from the container, this tragedy would have been avoided. Plaintiff started a fire inside of the mobile home, and there is no evidence in the record to show that a gasoline container explosion, rather than this initial fire, was the cause of the tragedy.

For the above reasons, the Court GRANTS Defendant's motion for summary judgment as to all of Plaintiff's claims because Defendant has shown that Plaintiff has insufficient evidence to allow a reasonable jury to find that an explosion of the Blitz gas container caused the injuries to Plaintiff or the injuries and death of her daughter. Because Defendant does not bear the burden of proof at trial, pointing to Plaintiff's failure to produce any evidence in support of her claim is sufficient for summary judgment. *See Clark*, 929 F.2d at 606–08.

D. *Plaintiff's Motion to Exclude the Expert Testimony of Vytenis Babrauskas*

Plaintiff has moved to exclude the testimony of Defendant's designated expert Vytenis Babrauskas, Ph.D, and author of the *Ignition Handbook*. [Doc. 139]. Because the Court finds that, even absent Babrauskas' testimony, summary judgment should be granted based on the absence of causation evidence in the record, Plaintiff's motion is DISMISSED AS MOOT. [Doc. 139].

E. *Motion to Compel Discovery*

Plaintiff has filed a motion to compel the deposition testimony of Defendant's corporate representative under Federal Rule of Civil Procedure 30(b)(6). Plaintiff's motion also seeks sanctions and an extension of time in which to conduct discovery. [Doc. 114]. The Court DISMISSES AS MOOT Plaintiff's motion to compel and for sanctions. [Doc. 114]. The categories of testimony sought by Plaintiff consist solely of information pertaining to the technological and economic feasibility of designing a gas container with a flame arrester, such as the cost of manufacturing each of Defendant's models of gas containers, Defendant's gross receipts from sales of gas containers, and Defendant's sale price to retailers for each model of gas container.

it does not appear that the parties have submitted the text of the warning to the Court other than in photographs of the Blitz gasoline container, which are illegible. [Walker Dep., Doc. 122, Exs. 5, 6].

[Doc. 114, at 53–54]. Because there is insufficient evidence to allow a reasonable fact finder to conclude that the design of the gas container caused the injuries and death in this case, any testimony regarding the feasibility of including a flame arrester in Defendant's gas container design is irrelevant. Plaintiff's motion to compel Defendant's corporate representative to testify regarding the feasibility of flame arresters is DISMISSED AS MOOT. [Doc. 114].

## IV. CONCLUSION

The Court has carefully considered the filings of the parties. In summary, Plaintiff's motion for leave to file an amended complaint [Doc. 138] is DENIED and Defendant's motion for summary judgment [Doc. 120] is GRANTED. Defendant's motions to strike the expert reports of Armstrong, Stevens, and Mardirosian [Docs. 155, 157, 158] are GRANTED in part and DISMISSED in part AS MOOT. Plaintiff's motion to exclude the testimony of Defendant's expert witness [Doc. 139] is DISMISSED AS MOOT. Defendant's motion for leave to respond to Plaintiff's motion to compel discovery [Doc. 163] is GRANTED, Plaintiff's motion to compel discovery [Doc. 114] and Plaintiff's Motion to Strike [Doc. 203] are DISMISSED AS MOOT.